**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

**JENDYS ESCALONA MENDOZA,**

    *Petitioner*,

v.　　　　　　　　　　　　　　　　　　　　**Case No. 5:26-CV-0441-JKP**

**KRISTI NOEM, et al.,**

    *Respondents*.

## ORDER GRANTING
## <u>PETITION FOR WRIT OF HABEAS CORPUS</u>

Before the Court is a Petition for Writ of Habeas Corpus (ECF No. 1) filed pursuant to 28 U.S.C. § 2241. Respondents (sometimes referred to as "the Government") have filed a response (ECF No. 5). Although Petitioner did not file a reply brief, he did file a recent supplemental brief (ECF No. 7) to address *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026).  He has also filed a Motion to Expedite Ruling (ECF No. 8). The petition is ready for ruling and there is no need to wait for a response to the motion.

The Court **DENIES** the motion as unnecessary. While the Court understands the urgency for a ruling, it also recognizes that it, and the Western District of Texas in general, has been inundated with similar petitions for writ of habeas corpus alleging unlawful detention in the immigration context. Given the sheer number of cases, there are inherent delays in reaching the merits of any particular habeas petition. Still, the Court is according appropriate expediency to its habeas docket. Unnecessary motions hinder progress and drain valuable judicial resources. With that said, the Court acknowledges that Petitioner is a material witness in a criminal proceeding in Iowa set for trial for March 23, 2026. Such information may warrant even greater expediency, but the Court has reached the petition through its typical habeas process and grants the petition after reviewing the briefing, provided evidence, and applicable law.

## I. BACKGROUND

Petitioner, a native and citizen of Cuba, applied for admission at the Nogales, Arizona port of entry on October 10, 2024. At that time, immigration authorities paroled Petitioner into the United States under § 212(d)(5) of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1182(d)(5). When parole is granted at a port of entry, the noncitizen is given a "DT" designation for his "Class of Admission." *See* ECF No. 1-3 ("Most Recent I-94 Results" using DT designation). A Notice to Appear ("NTA") dated that same date classified Petitioner as "an arriving alien"; placed him into removal proceedings under § 240 of the INA, codified at 8 U.S.C. § 1229a; and charged him as subject to removal under the INA as immigrant without proper documentation. The NTA directed him to appear on September 20, 2028, to show why he should not be removed.

Petitioner provides documentation from I-94 records that he was paroled into the United States with an initial authorized stay period valid through October 9, 2026, while other I-94 documentation shows an "Admit Until Date" of April 18, 2025. "Form I-94 records an admitted alien's arrival and departure ("admit until") dates." *Texas v. Mayorkas*, 743 F. Supp. 3d 900, 904 n.2 (W.D. Tex. 2024). The "Admit Until Date is the date that the traveler's immigrant status expires." U.S. Customs and Border Protection, I-94 Expiration Dates, https://www.cbp.gov/sites/default/files/documents/502386%20-%20I-94%20Fact%20Sheet_OFO.pdf (last visited March 17, 2026). Respondents were unable to identify the source of the October 2026 date, but do not contest its validity at some point in time. Respondents' own search showed that, as of the date of their search of the electronic database, Petitioner's parole had expired as of April 18, 2025. It thus appears that, at some point after Petitioner was paroled into the United States, his "Admit Until Date" was changed by more than a year. And both dates were well before his scheduled appearance to show why he should not be removed.

Petitioner has resided in the United States and built a life here since his parole into the

country in October 2024. He has no criminal history and has complied with the terms of his release. There is no indication that he is either a flight risk or a danger to the community. He has applied for an adjustment of status using Form I-485. While there may be some dispute as to whether his parole ended in April 2025 or whether it does not end until October of 2026, immigration authorities detained him in October 2025 without warning or explanation.

Immigration authorities took Petitioner into custody on October 29, 2025. He contends that the Government has violated the INA and his Fifth Amendment due process rights. He seeks immediate release from his detention or an individualized bond hearing. Through his Supplemental Brief, Petitioner concedes that his statutory claim is now foreclosed by *Buenrostro-Mendez* but argues that the case does not foreclose habeas relief for constitutional violations. More specifically, he argues that nothing in *Buenrostro-Mendez* authorizes the Government to re-detain a noncitizen after a prior release in violation of the Fifth Amendment's Due Process Clause, or to detain a noncitizen following a warrantless arrest that violates the Fourth Amendment.

Respondents have filed nothing in response to Petitioner's supplemental brief. In their response to the Petition, they assert that Petitioner's detention is mandated by 8 U.S.C. § 1225(b)(2) and that when Petitioner's parole expired in April 2025, § 1182(d)(5) required him to "forthwith return or be returned to the custody from which he was paroled," i.e., reverting to an arriving alien at the port of entry in Nogales. They do not assert any jurisdictional impediments applicable to this case. They instead argue that as applied to Petitioner, § 1225(b)(2)(A) comports with due process.

## II. JURISDICTION

Jurisdiction is always an initial consideration because it concerns the Court's power over a case. *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 466 (5th Cir. 2024). "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of*

*Am.*, 511 U.S. 375, 377 (1994)). They "must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001).

Several sections of the INA, codified at 8 U.S.C ch. 12 § 1101 et seq., curtail the jurisdiction of federal district courts in immigration cases. *See Jennings v. Rodriguez*, 583 U.S. 281, 292–96 (2018). Respondents do not invoke any specific argument as to this Court's jurisdiction. This Court, moreover, has rejected jurisdictional arguments in similar cases. *See*, *e.g.*, *Davila Mercado v. Lyons*, No. 5:25-CV-1623-JKP, 2025 WL 3654268, at *2–5 (W.D. Tex. Dec. 11, 2025) (rejecting arguments under 8 U.S.C. §§ 1225(b)(4), 1252(b)(9), and 1252(g)); *Hernandez-Fernandez v. Lyons*, No. 5:25-CV-0773-JKP, 2025 WL 2976923, at *2 (W.D. Tex. Oct. 21, 2025) (rejecting arguments under 8 U.S.C. § 1252(g), § 1252(a)(5), § 1252(b)(9), and § 1226(e)). Jurisdiction does not preclude review of the habeas claims raised in this case.

### III. LEGAL STANDARD

The Supreme Court has referred to the "Great Writ" as "perhaps the most important writ known to the constitutional law of England, affording as it does a swift and imperative remedy in all cases of illegal restraint or confinement" and "[r]eceived into our own law in the colonial period." *Fay v. Noia*, 372 U.S. 391, 400 (1963), *overruled in part on other grounds*, *Wainwright v. Sykes*, 433 U.S. 72 (1977), and *abrogated in part on other grounds by Coleman v. Thompson*, 501 U.S. 722 (1991). The importance of this Great Writ was not lost on the Justices of the Civil Rights era who recognized that the writ's

> function has been to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints. Its root principle is that in a civilized society, government must always be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release. Thus there is nothing novel in the fact that today habeas corpus in the federal courts provides a mode for the redress of denials of due process of law. Vindication of due process is precisely its historic office.

4

*Id*. at 401–02.

"Only in the rarest of circumstances has Congress seen fit to suspend the writ." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). Moreover, "absent suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Id*. (citing U.S. Const., Art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it")). Indeed, absent suspension, it is available to "challenge the legality of their detention" by "noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty," such as Guantanamo Bay. *Boumediene v. Bush*, 553 U.S. 723, 770 (2008). The Great Writ remains "a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law." *Hamdi*, 542 U.S. at 525 (citing *Imm. & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 301 (2001), *superseded by statute on other grounds as stated in Nasrallah v. Barr*, 590 U.S. 573, 580 (2020)).

The fundamental protection of habeas corpus applies to immigration-related detention. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001). Indeed, the Supreme Court in *Zadvydas* noted:

> It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.

*Id*. at 693 (citations omitted). This "distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Id*.

Habeas petitioners must show they are "in custody in violation of the Constitution or laws or treaties of the United States." *Villanueva v. Tate*, 801 F. Supp. 3d 689, 696 (S.D. Tex. 2025) (quoting 28 U.S.C. § 2241(c)(3)); *accord Orellana v. Kyle*, 65 F.3d 29, 31 (5th Cir. 1995) (per curiam) (recognizing that habeas relief cannot "be had absent [an] allegation" that the petitioner

"has been deprived of some right secured to him or her by the United States Constitution or the laws of the United States"). They "bear[] the burden of proving that [they are] being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy [this] burden of proof by a preponderance of the evidence." *Villanueva*, 801 F. Supp. 3d at 696 (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011) and citing *Bruce v. Estelle*, 536 F.2d 1051, 1058 (5th Cir. 1976)). Courts "considering a habeas petition must 'determine the facts and dispose of the matter as law and justice require.'" *Id.* at 697 (quoting 28 U.S.C. § 2243).

## IV. ANALYSIS

This Court recently issued an order granting habeas relief to a petitioner who had demonstrated a procedural due process violation. *See Longoria Mendoza v. Noem*, No 5:26-CV-0728-JKP (W.D. Tex. Feb. 26, 2026). While there are differences between this case and *Longoria Mendoza*, none warrant a different result.

For the reasons stated in *Longoria Mendoza,* the recent decision of the Fifth Circuit in *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026) precludes statutory claims premised on 8 U.S.C. § 1225(b) but does not preclude constitutional claims. *See Longoria Mendoza*, No 5:26-CV-0728-JKP, unpub. order at 7–9.

### A. Earlier Due Process Cases

An early decision out of El Paso focused on the merits of the petitioner's procedural due process claim based on detention without an individualized bond hearing. *See Lopez-Arevelo v. Ripa*, 801 F. Supp. 3d 668, 681–87 (W.D. Tex. 2025). In doing so, it rejected the Government's reliance on *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 140 (2020) by distinguishing the case in two important respects: (1) *Thuraissigiam* addressed removability or deportability rather than mandatory detention under 8 U.S.C. § 1225(b) and (2) the petitioner in *Thuraissigiam* did not have a significant presence in the United States, whereas the petitioner

6

before the El Paso court lived in the United States for three years and "built a life here" after being "released on his own recognizance two days" following his initial detainment "shortly after entering the country." *See* 801 F. Supp. 3d at 681–85. In a nutshell, the court found that the petitioner could pursue his due process claim because the petitioner "challenge[d] his detention, not his deportability" and "because he was detained after years of presence in the United States, rather than on the threshold of initial entry." *Id*. at 685. The undersigned has specifically agreed with and essentially followed *Lopez-Arevelo*. *See Hernandez-Fernandez v. Lyons*, No. 5:25-CV-00773-JKP, 2025 WL 2976923, at *7–10 (W.D. Tex. Oct. 21, 2025).

## B. Merits of Due Process Claim

With *Thuraissigiam* not posing an obstacle to the assertion of a due process claim, the Court turns to the merits of such a claim. Under the Due Process Clause of the Fifth Amendment, "[n]o person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Further, the Supreme Court has long recognized "that the Fifth Amendment entitles aliens to due process of law" in the context of removal proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993) (citing *Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903) (sometimes referred to as *The Japanese Immigrant Case*)); *accord Trump v. J. G. G.*, 604 U.S. 670, 673 (2025) (per curiam).

"Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950) (addressing due process claim under the Fourteenth Amendment). "Given the undeniable 'textual parallel

between the Fifth and Fourteenth Amendments' courts 'understandably construe[ ] 'due process of law' to mean the same thing under the Fifth and Fourteenth Amendments alike.'" *C.M. v. United States*, 672 F. Supp. 3d 288, 342 (W.D. Tex. 2023) (quoting *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 243 (5th Cir. 2022) (Ho, J., concurring)).

The circumstances and nature of a given case may affect various aspects of the due process analysis. The analysis may differ significantly depending on the location of a noncitizen's encounter with immigration authorities—whether at the border or in close proximity thereto versus within the interior of the United States. It may be affected on whether the noncitizen has had prior encounters with immigration authorities and, if so, whether the noncitizen had been granted some sort of release previously. Immigration authorities, moreover, may release a noncitizen from detention in several ways—through various forms of parole, an order of supervision, or even on the noncitizen's own recognizance. Whether or not re-detention is at issue, the life that the noncitizen has built and developed within the United States impacts the due process analysis.

Once a noncitizen has been provided a pathway for release and entry into the United States subject to whatever terms are imposed, the release may create a cognizable liberty interest protected by the Fifth Amendment. *See, e.g.*, *Zhu v. Genalo*, 798 F. Supp. 3d 400, 408 (S.D.N.Y. 2025). Not only do criminal parolees have a liberty interest "that parole will be revoked only if [the parolee] fails to live up to the parole conditions," *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972), but civil detention further limits the circumstances justifying detention without violating due process, *see Zadvydas*, 533 U.S. at 690.

Due process protection remains even if government authorities have discretion to revoke supervision. *Zhu*, 798 F. Supp. 3d at 408. Detention without notice or explanation as required by regulation likewise "involves Petitioner's protected interest in his continued liberty." *Id*. This differs from a challenge to the general discretionary authority that might be available to revoke the

release. *Id.*

Further, even in circumstances lacking a prior detention, release, and re-detention, noncitizens already in the country who have "established a life here—albeit without authorization," possess "a strong liberty interest in their freedom from detention." *Martinez v. Noem*, No. EP-25-CV-430-KC, 2025 WL 2965859, at *4 (W.D. Tex. Oct. 21, 2025). This is "consistent with the longstanding principle that due process applies to those who are present in the interior of the United States, regardless of their citizenship status." *Id.*

"Once it is determined that due process applies, the question remains what process is due." *Morrissey*, 408 U.S. at 482. The flexibility of due process "calls for such procedural protections as the particular situation demands." *Id.* This "does not mean that judges are at large to apply it to any and all relationships." *Id.* Instead, the flexibility of due process lies "in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure." *Id.* Supreme Court cases "underscore the truism that due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place, and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (cleaned up). Thus, "identification of the specific dictates of due process generally requires consideration of three distinct factors." *See id.* at 335. As succinctly stated in *Mathews*, the three factors are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.*

Whether the Government has previously released an individual into the community and later seeks to re-detain that person, or whether the individual within the United States has simply

9

established a life here, procedural due process requires an individualized assessment consistent with the framework articulated in *Mathews*. Courts addressing the merits of an asserted procedural due process claim apply the three-part *Mathews* test. *See*, *e.g.*, *Lopez-Arevelo*, 801 F. Supp. 3d at 685; *Hernandez-Fernandez*, 2025 WL 2976923, at *8–10.

In the immigration detention context involving noncitizens with a substantial presence in the United States who have not received any individualized assessment of flight risk or dangerousness, each of the three factors—affected private interest; risks of erroneous deprivation, including "the probable value, if any of additional or substitute procedural safeguards"; and the Government's interest—support finding that the noncitizen has been denied procedural due process. *See*, *e.g.*, *Martinez*, 2025 WL 2965859, at *4–5. Even in cases where there has been a re-detention of a non-citizen after such person had received or effectively received the individualized assessment of flight risk and dangerousness, courts may approach the circumstances the same, with the same results from the *Mathews* test. *See*, *e.g.*, *Lopez-Arevelo*, 801 F. Supp. 3d at 674–75, 685–87 (addressing due process violation in context of a non-citizen who first encountered immigration authorities on the day of entry, applied for asylum and withholding of removal, and was released for three years before ICE arrested him after a hearing connected to his removal proceedings); *Hernandez-Fernandez*, 2025 WL 2976923, at *8–10 (addressing due process violation in context of a non-citizen who first encountered immigration authorities soon after entry, was released two days after entry on an Order of Release on Recognizance, and remained on release for three years before ICE arrested him at a routine check-in appointment). Notably, the re-detention context also presents a due process claim when the Government revokes release without notice or explanation. *See*, *e.g.*, *Zhu*, 798 F. Supp. 3d at 408.

There is no reason to overdo the analysis on the *Mathews* factors. No one can reasonably question that freedom from physical detention is one of the most sacred and elemental of liberty

interests.

Further, when a noncitizen was previously released, which in and of itself reflects a determination that the individual is neither a flight risk nor a danger to the community, there is "a very high risk of erroneous deprivation of liberty" absent an individualized custody determination. *Cruz-Reyes v. Bondi*, No. 5:26-CV-60, 2026 WL 332315, at \*7 (S.D. Tex. Feb. 3, 2026). "Without an individualized hearing, there is substantial risk that noncitizens with a substantial presence in the United States who pose neither flight risk nor danger to the community will be detained. An individualized assessment before an immigration judge substantially reduces this risk." *Aliaga Zamora v. Bondi*, No. SA-26-CA-00447-XR, 2026 WL 693054, at \*13 (W.D. Tex. Mar. 10, 2026). Such an individualized hearing "ensures the purpose of detention is not punitive." *Id*. When the Government has already released the Petitioner "into the interior," it "has already concluded that he does not present a flight or security risk." *Id*. Absent "evidence of a change in the individualized circumstances, there is no reason to believe that re-detention serves any permissible purpose of confinement." *Id*.

In the re-detention context, "the almost nonexistent procedural protections provided to Petitioner markedly increased the risk of an erroneous deprivation of his private liberty interests, including whether the revocation determination was made by an authorized person." *Zhu*, 798 F. Supp. 3d at 415 n.4 (cleaned up). And in that same context, "the Government's interests, presumably in effectively carrying out orders of removal, are legitimate, but would not be undercut by additional procedural safeguards as minimal as notice and an informal interview." *Id*.

Similarly, a substantial risk of erroneous deprivation of liberty exists when the Government detains a noncitizen without bond who was arrested within the United States and lacks any prior release by immigration authorities, but who has established a life here in the United States. *See Martinez*, 2025 WL 2965859, at \*4.

11

In this case, Petitioner lived in the United States following his release in October 2024. For a year he established a life here in the United States. While that timeframe is shorter than the three years presented in *Hernandez-Fernandez*, it may suffice to establish a significant presence that requires due process protection. The circumstances of this case, moreover, include a prior encounter with immigration authorities who determined in October 2024 that Petitioner should be paroled into the United States. On the same date he was paroled into the United States, an issued NTA ordered him to appear on September 20, 2028, to show why he should not be removed.

Petitioner's release into the United States on parole provided him a right to due process protection in the termination of that parole. Although parole is subject to automatic termination "(i) upon the departure from the United States of the [noncitizen], or, (ii) if not departed, at the expiration of the time for which parole was authorized," 8 C.F.R. § 212.5(e)(1), Petitioner did not depart from the United States and his parole was initially authorized until October 2026, with a later change to April 2025. While it appears that, at some unspecified point, the end date for Petitioner's parole was moved up to April 2025, nothing indicates that Petitioner was aware of any such change prior to his detention. Due process requires notice of a changed parole expiration date.

When parole is not automatically terminated through § 212.5(e)(1), the regulation requires written notice of the termination. *See* 8 C.F.R. § 212.5(e)(2)(i). Further, "[w]hen a charging document is served on the [noncitizen], the charging document will constitute written notice of termination of parole, unless otherwise specified." *Id*. The only charging document of record is the NTA dated the same day that Petitioner was paroled into the United States. Such simultaneous parole and charge might be sufficient to satisfy the "unless otherwise specified" clause to find that the NTA did not terminate the parole.

But even if the NTA constitutes written notice of parole termination, all parties agree that Petitioner was on parole at least through April 2025. Per § 212.5(e)(2)(i) and the issued NTA,

Petitioner was in immigration proceedings under INA § 240, and the regulation contemplates that, when an "exclusion, deportation, or removal order cannot be executed within a reasonable time, the [noncitizen] shall again be released on parole unless in the opinion of the official listed in paragraph (a) of this section the public interest requires that the alien be continued in custody." While the regulation speaks in terms of execution of an existing removal order, such parole release appears properly within the discretion accorded under the regulation when a removal order cannot be executed within a reasonable time, whether such an order then exists or simply remains as a future result of the immigration process.

Under the facts here, when immigration authorities detained Petitioner in October 2025 without notice or explanation, he had been released into the United States with an initial parole termination date in October 2026. Without notice of the changed expiration date to April 2025, his parole did not automatically terminate in April. That is so because notice is an integral part of any termination of parole. When an initial date passes, the regulation does not require written notice of the parole termination because the initial grant of parole with a specified end date provides the requisite notice. But when the initial parole date is moved up, notice of such change is necessary. In this case, nothing indicates that Petitioner received notice of any change in his parole termina-tion date. Further, noting indicates that Respondents applied their internal policies or regulations for terminating his parole or to provide any notice of their reason for the termination or changed date. In addition, once Respondents detained Petitioner following the termination of his parole without notice, they provided no individualized hearing that would substantially reduce the risk of an erroneous deprivation of Petitioner's due process rights.

To counter Petitioner's due process claim, Respondents first rely on *Thuraissigiam*. But the Court has already found that case does not preclude Petitioner's due process claim. Relying on a January 2026 decision by the Honorable District Judge Xavier Rodriguez, Respondents attempt

to bolster their reliance on *Thuraissigiam*. Resp. at 4 (citing *Goguev v. Noem*, No. 5:25-CV-1593-XR (W.D. Tex. Jan. 13, 2026)). But, recognizing the fast-changing immigration landscape, Judge Rodriguez recently departed from his holdings in that case due to a "growing consensus" of courts consistently finding "that detaining aliens with substantial United States presence without any individualized assessment of flight risk and dangerousness deprives them of their constitutional right to procedural due process." *Aliaga Zamora*, 2026 WL 693054, at \*9 & n.8. Accordingly, to the extent that *Goguev* may have supported a contrary position at one time, it no longer does so.

Under the facts and circumstances of this case, the Court finds that Petitioner is entitled to habeas relief based upon his Fifth Amendment due process claim, his detention is unlawful, and habeas relief is proper.

## C. Remedy

Petitioner's immediate release is the proper habeas remedy for violating Petitioner's due process rights in revoking his parole without notice. *See Zhu*, 798 F. Supp. 3d at 415. Further, as fully explained and explored in *Longoria Mendoza v. Noem*, No 5:26-CV-0728-JKP (W.D. Tex. Feb. 26, 2026), in general, the proper remedy for a due process violation is for Respondents to release Petitioner from his detention. The Court finds no need to revisit the matter. Respondents even argue that release is the only remedy through habeas. "Habeas is at its core a remedy for unlawful executive detention. The typical remedy for such detention is, of course, release." *Munaf v. Geren*, 553 U.S. 674, 693 (2008).

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Petition for Habeas Corpus (ECF No. 1). It **DENIES** the Motion to Expedite Ruling (ECF No. 8) as unnecessary. It is **ORDERED** that:

1. **On or before March 19, 2026**, Respondents shall **RELEASE** Petitioner Jendys Escalona Mendoza from custody to a public location, under conditions no more restrictive than those

in place before the detention at issue.

2. Respondents must **NOTIFY** Petitioner's counsel of the exact location and exact time of release as soon as practicable and no less than two hours before release.

3. Any possible or anticipated removal or transfer of Petitioner under this present detention is **PROHIBITED**.

4. Respondents shall **FILE** a Status report no later than **March 20, 2026**, confirming that Petitioner has been released. If counsel for Petitioner disagrees with any aspect of the filed Status Report, counsel may file a separate Status Report.

A final judgment will be issued separately.

**IT IS SO ORDERED this 17th day of March 2026.**

_____
**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**

15